[Criminal No. 654.   Filed March 19, 1928.]

[265 Pac. 602.]

THE ATCHISON, TOPEKA & SANTA FE RAIL-WAY COMPANY, a Corporation, Appellant, v. STATE, Appellee.

Messrs. Chalmers, Fennemore & Nairn, Mr. E. W. Camp, Mr. Robert Brennan and Mr. E. T. Lucey, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. P. A. Sawyer, County Attorney, for the State.

McALISTER, J.—This is an appeal by the Atchison, Topeka & Santa Fe Railway Company from a judgment of conviction and sentence pronounced thereon for the alleged violation of paragraph 403 of the Revised Statutes of 1913, Penal Code, which reads as follows:

"403. No railway company, or corporation operating a line or lines of railway within this state, shall hire, employ, or permit any person to act as telegraph or telephone operator for the purpose of receiving or transmitting messages, orders, or other instructions, governing or affecting the movement of any train or trains, unless said person shall be at least eighteen years of age and have had not less than one year's experience as a telegraph operator."

The succeeding paragraph, 404, makes any violation of this provision a misdemeanor.

Appellant had in its employ a conductor, Elwin James Tilson, who, on April 18, 1925, was in charge of a freight train running from Gallup, New Mexico, to Winslow, Arizona. His train stopped at Cheto, a station without a telegraph operator just west of

the New Mexico line, about 4:48 P. M. that day, and after waiting there about an hour he went into a booth and called the train dispatcher at Winslow by telephone for information as to the movement of his train. The latter gave him over the 'phone in reply an order which in effect informed him that train No. 36, engine 3245, would wait for him at Adamana, which was sixty-seven miles west, until 7:15 P. M. instead of 7:00 P. M., and in accordance with the rules of the company he made the original and two copies of this order giving one each to the engineer and the brakeman.

Tilson was fifty-one years of age and had been in the employ of appellant as conductor for twenty years but had never been a telegraph operator though he had used telephones since he was fifteen years of age and had had experience with them on the railroad for taking orders respecting the movements of trains since they were installed by the Santa Fe some ten or twelve years prior to 1925. He was employed and paid wages as a conductor and only took telephone orders in that capacity. Prior to the installation of telephones by the appellant orders affecting the operation of trains were received through telegraph offices along the line, or by the conductors themselves, many of them being telegraph operators.

The information charges in substance that in the operation of its railroad appellant wilfully and unlawfully permitted and caused said Elwin James Tilson, while in its employ as a conductor, to act as a telephone operator for the purpose of receiving an order (the one above mentioned) governing the movement of a train over its line of railway in Arizona, when he, the said Tilson, had had less than one year's experience as a telegraph operator.

In its assignments appellant contends that in so far as paragraph 403 applies to a railroad company's

right to hire a person who has not had one year's experience as a telegrapher, or even to permit such a one after employment, to act as a telephone operator for the purpose of receiving or transmitting orders or messages affecting the movement of trains it violates both the state and federal Constitutions. The claim is that it contravenes section 4, article 2, of the former and the fourteenth amendment to the latter in that it deprives appellant of its liberty and property without due process of law, and also section 13 of article 2, and section 19 of article 4 of the state Constitution, which prohibit the legislature from enacting a law granting to any citizen, individual or corporation any special privilege. The position of appellee, the state, however, is that it was passed for the sole purpose of protecting railroad employees and the traveling public from the dangers brought about as a result of orders affecting the movement of trains being taken over the telephone by engineers, firemen, trackmen, conductors and inexperienced operators, and, therefore, that it is a safety measure which the legislature, in the proper exercise of the state's police power, was justified in passing.

It is plain that it is a regulatory act and we take it that its passage was prompted by a conviction on the part of the legislature that the safety of train crews and passengers would be promoted by prohibiting any except those possessing certain qualifications from receiving or transmitting over the telephone orders and messages affecting the movement of trains. Such being its purpose there can be no question but that its enactment was proper as a police regulation if its provisions are not arbitrary and unreasonable or if they sustain an obvious relation to the evil they were intended to remedy, for the field in which legislation in the interest of the public health or safety may be enacted under the

police power is very broad, but it does not extend far enough to include unreasonable or arbitrary measures or those having no real connection between their provisions and their avowed purpose, that is, those not reasonably adapted to accomplish the end sought to be attained. 6 R. C. L. 237. This principle is accepted by all the courts and in *Ritchie* v. *People*, 155 Ill. 98, 46 Am. St. Rep. 315, 29 L. R. A. 79, 40 N. E. 454, is found this statement of it:

"The police power of the state is that power which enables it to promote the health, comfort, safety, and welfare of society. It is very broad and far reaching, but is not without its limitations. Legislative acts passed in pursuance of it must not be in conflict with the Constitution, and must have some relation to the ends sought to be accomplished; that is to say, to the comfort, welfare or safety of society. Where the ostensible object of an enactment is to secure the public comfort, welfare or safety, it must appear to be adapted to that end; it cannot invade the rights of persons and property under the guise of a mere police regulation, when it is not such in fact."

The only inquiry, therefore, is whether the requirement that no person who has had less than one year's experience as a telegraph operator shall be employed by a railway company, or permitted by it after employment, to receive or transmit by telephone an order or message affecting the movement of a train is a reasonable or arbitrary measure or one between whose terms and their evident purpose there is or is not a real connection.

Its purpose being evident the question arises whether its provisions are adapted to that end. That is, does it promote the safety of the crew and passengers of the train for those handling telephone orders affecting train movements to be telegraph operators with a year's experience? Just how much knowledge would make one more efficient as a tele-

phone operator does not appear. Neither in the act itself nor in the evidence is there anything indicating that it would, and that this is true is not strange since it is clear that the ability to hear or talk over the 'phone can in no way be enhanced by one's experience in sending or receiving messages by telegraph for a year or even a longer period. Would it not be just as reasonable or just as likely to produce the result the act seemingly intends to require that a person receiving or sending telephone messages concerning train movements must have theretofore spent a year in some other occupation, such, for instance, as that of mail clerk, section foreman, bookkeeper or traveling salesman, the duties of which, it will be agreed, tend in no degree whatever to qualify him the better for hearing or talking over the 'phone? Clearly it will be contended by no one that experience in any of these pursuits, any more than in telegraphy, would better equip a person to use the 'phone, and such being true it is difficult to understand how it can be said that the qualification prescribed, one year's experience as a telegraph operator, tends in any degree to accomplish or has any connection with the end to be attained, the promotion of the safety of the crew and passengers of a train.

If the act provided that before one could be hired or permitted to use the telephone for the purpose prescribed he shall have had a year's experience in *taking and sending train orders by telegraph* it might be plausibly argued that there is some connection between his training and the use he was hired or permitted to make of the 'phone, because under such circumstances one would naturally become familiar with train orders and be less likely to make a mistake in handling them, but any telegraph operator, even though he has followed commercial telegraphy exclusively and is without a day's ex-

perience in taking or sending train orders can qualify under this statute, yet without this additional requirement it is wholly lacking in relationship to the end to be attained. In this particular it is wholly unlike those measures regulating certain professions, callings and occupations, such, for instance, as the practice of law, medicine, steamboat piloting in some states or that of locomotive engineer (for color blindness) in others, which have been upheld as a valid exercise of the police power. *Nashville, C. & St. L. Ry. Co.* v. *State,* 83 Ala. 71, 3 South. 702; Id., 128 U. S. 96, 32 L. Ed. 353, 9 Sup. Ct. Rep. 28; *Petterson* v. *Board of Commissioners,* 24 Tex. Civ. App. 33, 57 S. W. 1002; *Olsen* v. *Smith et al.,* 195 U. S. 332, 49 L. Ed. 224, 25 Sup. Ct. Rep. 52; Id., (Tex. Civ. App.), 68 S. W. 320.

It is argued by appellee that the regular duties of engineers, brakemen and conductors are so numerous and important (the lives of the traveling public being in their hands) that the increased responsibility of taking by 'phone orders affecting the movement of trains should not be placed upon them and that to require or permit them to perform this extra service, which is wholly foreign to their regular employment, while discharging the duties for which they were employed, greatly increases the hazard to railroad employees and the public and should not be allowed. It may be true that permitting this to be done endangers the public safety to such an extent that it should not be allowed by the legislature, or other regulatory authority, and if it could be deduced from the terms of the act that it was the legislative intent to prohibit it altogether there would perhaps be little, if any, difficulty in sustaining appellee's position. But the fact that it does permit a class of persons to use the 'phone for this purpose discloses that it was not the intention of the legislature to prohibit its use entirely. If such had

been the end aimed at there is no reason why it should not have said so in plain, unequivocal language, but it did not do so and the court would not be justified in construing what it did say as having this effect indirectly, even though the number who can qualify under the act is small. When the qualification in question was prescribed in 1912 some trainmen were telegraph operators, a few being so even yet, and to say in view of this fact that the legislature intended by that requirement to prohibit altogether the use of the telephone for taking train orders would be tantamount to refusing to give effect to the plain meaning of the statute.

It follows that the means used to accomplish the end sought in paragraph 403 are wholly unsuited to its attainment and, therefore, that in so far as it requires one using the telephone to receive or transmit messages or orders affecting the movement of trains to have not less than one year's experience as a telegraph operator it is wholly foreign to the end it was intended to accomplish and is, therefore, unreasonable and arbitrary. Instead of producing the result desired its only effect is to reduce to a very small number the class from which those who use the telephone for receiving or transmitting orders or messages affecting train movements may be selected, and while this alone would not render it obnoxious to the constitutional provisions invoked, since it operates uniformly upon all of that class, yet its effect is to make a classification founded upon an unreasonable and arbitrary basis which renders it violative of both the state and federal Constitutions. *Hazas* v. *State,* 25 Ariz. 453, 219 Pac. 229.

The case more nearly in point than any to which our attention has been called is *Smith* v. *Texas,* 233 U. S. 630, 58 L. Ed. 1129, Ann. Cas. 1915D 420, 34 Sup. Ct. Rep. 681, L. R. A. 1915D 677, in which the Supreme Court of the United States had before

it a provision of the Penal Code of Texas (Laws Tex. 1909, chap. 46, § 2), making it a misdemeanor for a person to act as a conductor on a freight train without having for two years prior thereto served as a brakeman on a freight train. The Texas court of criminal appeals had held this act constitutional upon the ground that it was a valid exercise of the police power, since the training received as brakeman better qualified one to be a conductor (*Smith* v. *Texas,* 66 Tex. Cr. Rep. 383, 146 S. W. 900), but the federal Supreme Court reversed this ruling and declared the act invalid because it arbitrarily excluded persons just as familiar with the movement and operation of trains as brakemen from becoming freight conductors or showing their competency therefor. This was true, it was said, of firemen and engineers on all trains, and of brakemen and conductors on passenger trains, and the conclusion was that it amounted to a denial of both the liberty of contract without due process of law and the equal protection of the laws. It used the following language:

"So that the case distinctly raises the question as to whether a statute, in permitting certain competent men to serve, can lay down a test which absolutely prohibits other competent men from entering the same private employment. It would seem that to ask the question is to answer—and the answer in no way denies the right of the state to require examinations to test the fitness and capacity of brakemen, firemen, engineers, and conductors to enter upon a service fraught with so much of risk to themselves and to the public. But all men are entitled to the equal protection of the law in their right to work for the support of themselves and families. A statute which permits the brakeman to act—because he is presumptively competent—and prohibits the employment of engineers and all others who can affirmatively prove that they are likewise competent, is not confined to securing the public

safety, but denies to many the liberty of contract granted to brakemen, and operates to establish rules of promotion in a private employment. If brakemen only are allowed the right of appointment to the position of conductors, then a privilege is given to them which is denied all other citizens of the United States.''

The provisions of that act were not so obnoxious to the Constitution as those of 403, because it is plain that the qualification one was required to have before he could act as a conductor on a freight train was one that better fitted him for that position, and, therefore, that there was a connection between the purpose of the act and the means of attaining it, but notwithstanding this it was held unconstitutional because it excluded others just as well qualified by experience as brakemen from being conductors or even giving them an opportunity to prove their fitness therefor. It is equally clear in the case at bar that the qualification prescribed in no way better fits one for using the 'phone and, therefore, that there is wholly lacking in the act any relation between the end sought therein and the method of accomplishing it.

The acts of the legislature within constitutional limits are presumed to be valid and, because its discretion in determining what the interests of the public require and what measures are reasonably necessary to protect them is very large, the courts are reluctant to interfere with its work and will not do so unless it is clear that it has gone beyond the bounds of the fundamental law. In this instance, however, it seems plain to us that, in so far as it provides in section 403 that one who has had less than one year's experience as a telegraph operator shall not use the telephone in receiving and transmitting messages or other instructions affecting the movement of trains, it has done so, because it is

apparent that the portion of this paragraph dealing with the use of telephones is not within constitutional limits, though this is not true of the requirement that one who acts as a telegraph operator for the purpose mentioned therein must have a year's experience before he can do so. In fact, an investigation of the journal of the first state legislature discloses that, as introduced in that body by the late Senator Hughes of Pima county, this act dealt with telegraph operators exclusively, there being no reference whatever at that time, so far at least as the journal discloses, to telephones. Journal, First State Legislature, Senate Proceedings, p. 79. This was inserted by the committee to which the bill was referred, but in adding it the fact was evidently overlooked that the qualifications which the legislature may prescribe one shall have as a prerequisite to following certain professions, callings or occupations must tend, in some degree at least, to better qualify the person for such profession, calling or occupation before it can be said that a law requiring them promotes the public welfare or safety. Otherwise there is no limit and the constitutional provisions against interfering with the liberty of contract or prohibiting the passage of laws granting to any individual or class a special privilege have no reason for existence.

The judgment is reversed and the cause remanded with instructions to dismiss the information.

ROSS, C. J., and LOCKWOOD, J., concur.